# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIE ENGLISH, REMZI JAOS, RICARDO LOZA, BRENDA WOODALL, BASHIR B. NURUDDIN, TOM HALEY, and LEONARD SIMPSON, <br><br> Plaintiffs, <br><br> v. <br><br> SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 73, and DENISE POLYAC, individually and as former Trustee of SEIU, LOCAL 73, <br><br> Defendants. | No. 18 C 5272 <br><br> Judge Jorge L. Alonso |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Willie English, Remzi Jaos, Ricardo Loza, Brenda Woodall, Bashir B. Nuruddin, Tom Haley, and Leonard Simpson, bring this suit against their former employer and labor union, Service Employees International Union ("SEIU") Local 73, and Denise Polyac, formerly one of the trustees in charge of SEIU Local 73. Plaintiffs claim that they were terminated in violation of their rights as union members under the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 401 *et seq*. Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted.

## BACKGROUND

In August 2016, SEIU Local 73 was taken into trusteeship by SEIU, its international parent union. (*See* Defs.' Br. in Supp. of Mot. to Dismiss, Ex. A, SEIU Const. and Bylaws, Art. VIII, Sec. 7, ECF No. 18-1 at 20.) Plaintiffs were all employees and members of SEIU Local 73, as well as members of the Service Employees Staff Union ("SESU"), the exclusive collective

bargaining representative of Local 73 employees. Some of the plaintiffs held elective office in SESU. Plaintiffs disagreed with the policies, direction, and management of Local 73 under Polyac's trusteeship, and, while the trusteeship was still in place, plaintiffs independently formed a slate of candidates to campaign for election to leadership positions in the next Local 73 election.

Jaos began to publicly discuss the campaign, known as "Members Leading Members" ("MLM"), in March 2017. Poloyac threatened to terminate his employment unless he desisted and supported the trusteeship. In June 2017, Jaos was terminated.

In January 2018, the MLM campaign published its slate of candidates, which included plaintiffs, and their positions on a website. Within the month, English, Woodall, Loza, Nuruddin, Haley, and Simpson were all suspended and then terminated. Their termination letters specifically cited their involvement in the MLM campaign as the reason for their termination. Plaintiffs subsequently filed this suit.

## **ANALYSIS**

"A motion under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

The LMRDA "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982). "Tensions between union leaders and the rank-and-file members and allegations of union wrongdoing led to . . . legislation focused on disclosure requirements and the regulation of union trusteeships and elections," but that also provided "protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Id.* These provisions, "ultimately enacted . . . under the title of 'Bill of Rights of Members of Labor Organizations,'" *id.*, include the following:

> **(a)(1) Equal rights**
> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
>
> **(2) Freedom of speech and assembly**
> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his

refraining from conduct that would interfere with its performance of its legal or contractual obligations.

. . .

**(4) Protection of the right to sue**
No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

**(5) Safeguards against improper disciplinary action**
No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

LMRDA, Publ. L. No. 86-257, § 101, 73 Stat. 519 (1959), 29 U.S.C. § 411. The LMRDA also provides, similarly, that

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act. The provisions of section 102 shall be applicable in the enforcement of this section.

LMRDA § 609, *see* 29 U.S.C. § 529. These protections, Congress judged, were "necessary to further the [LMRDA's] primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships." *Finnegan*, 456 U.S. at 436. Whenever "rights secured" by these provisions "have been infringed," the victim may bring a civil action in a United States district court. LMRDA § 102, 29 U.S.C. § 412.

Plaintiffs claim that their abrupt suspensions and terminations based on their disagreements with the trusteeship and Local 73 management over policy issues violated their rights under the above-cited provisions of the LMRDA. Additionally, plaintiffs claim that their dismissals were without just cause and without notice or due process, in violation of the collective bargaining agreement between Local 73 and the SESU.

## I.    LMRDA CLAIMS

Defendants argue that the Court should dismiss plaintiffs' LMRDA claims because the LMRDA, for all the protections it provides to "union members as members," does not protect appointed union *employees*, even if they are also union members, against "discharge from union employment." *Finnegan*, 456 U.S. at 437-38. As the Supreme Court explained in *Finnegan*, discharge from appointed union employment does not "impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees." *Id.* at 438. Therefore, the LMRDA "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own," *id.* at 441, and, correspondingly, to discharge those employees whose views are not. Defendants argue that *Finnegan* permitted Local 73 to terminate plaintiffs and requires dismissal of their LMRDA claims.

Plaintiffs respond that *Finnegan* does not apply here because they were *elected* officers, not merely appointed employees, as in *Sheet Metal Workers' International Association v. Lynn*, 488 U.S. 347, 355 (1989). In *Lynn*, the Supreme Court explained that the removal of an elected union official implicates different concerns than removing an appointed union official because it "denie[s]" to "union members . . . the representative of their choice," and it causes a "more pronounced" chilling effect on the free speech of union members with respect to issues of union

5

governance. *Lynn*, 488 U.S. at 355. Unlike in *Finnegan*, where an elected union official's removal of an appointed union official who had not supported his campaign helped to "ensure[] [the] union administration's responsiveness to the mandate of the union election," 456 U.S. at 441, the removal of an employee who is an elected official himself "deprive[s] the membership of his leadership, knowledge, and advice," *Lynn*, 488 U.S. at 355, which they have specifically availed themselves of by electing him, and therefore undermines the objective of the LMRDA.

But there is a flaw in plaintiffs' reasoning: at the time of their suspension and termination, plaintiffs were *not* elected officials in Local 73. Jaos was allegedly an elected board member at the time the trusteeship was imposed, but he was thereupon removed from the Executive Board (Compl. ¶ 10, ECF No. 1), as were all "officers," automatically. (*See* SEIU Const. and Bylaws, Art. VIII, Sec. 7(a) ("appointment [of a Trustee] shall have the effect of removing the officers of the Local Union"), ECF No. 18-1 at 20.) English, Woodall, Nuruddin, and Haley were allegedly elected officers of SESU, the staff union, but plaintiffs have not sued SESU, and they were not elected officers of Local 73. It would contort *Lynn* beyond recognition to interpret it to prohibit labor union leaders from terminating union employees merely because they happen to be elected officials in some other union; in such a case, the LMRDA's concerns about "[t]ensions between union leaders and the rank-and-file members" are attenuated because the terminating leadership and the terminated elected members are in different unions. True, in this case there is some overlap between the two unions, but Local 73's membership is larger and broader than SESU's, so plaintiffs were the chosen representatives of only a subset of Local 73 members, and in a capacity that affected only the subset, not the entire Local 73 membership. Thus, plaintiffs' status as elected officials of SESU has little to do with the goal of "ensur[ing]" that Local 73, the larger entity, is "democratically governed, and responsive to the will of the union membership." *See Finnegan*,

456 U.S. at 441; *see also id.* at 436. The Court does not find plaintiffs' argument persuasive in this regard.

Plaintiffs also argue that *Finnegan* is not applicable because the decision to terminate the union-employee plaintiffs in that case was made by an *elected* union leader who was merely implementing his electoral mandate to "choose a staff whose views are compatible with his own . . . to carry out his policies." *Id.* at 441-42; *see id.* at 441 ("[T]he ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the election."). According to plaintiffs, when, as here, the union is under the direction of an unelected trustee, the rights of "union members as members," *id.* at 437-38, under the LMRDA are not "outweighed by the need" to permit the union leadership to choose its own staff, given that the leadership is not the product of the sort of "democratic choice made by the union electorate" that the LMRDA exists to protect and support. *See Lynn*, 488 U.S. at 354-55.

But this view is foreclosed, at least as far as this Court is concerned, by the Seventh Circuit's decision in *Vought v. Wisconsin Teamsters Joint Council No. 39*, 558 F.3d 617, 622-23 (7th Cir. 2009). In *Vought*, the court specifically considered whether *Finnegan* applies even when an unelected union administrator terminates union employee-members based on differences over union politics, and it concluded that *Finnegan* applies just the same. The court reasoned that, while it is "doubt[ful]" that any such termination advances the "'LMRDA's basic objective,'" 558 F.3d at 623 (quoting *Lynn*, 488 U.S. at 354), of ensuring "'that unions [are] democratically governed, and responsive to the will of the union membership,'" neither does it "thwart[] it," 558 F.3d at 623 (quoting *Finnegan*, 456 U.S. at 441). The court recognized that, in *Finnegan*, the Supreme Court had explained that "'it was rank-and-file union members—*not* union officers or employees, as

7

such—whom Congress sought to protect'" in the LMRDA, which does not "'establish a system of job security or tenure for appointed union employees.'" *Vought*, 558 F.3d at 621 (quoting 456 U.S. at 436-37, 438). Thus, in enacting the LMRDA, "Congress decided that the harm that may occasionally flow from union leadership's ability to terminate appointed employees is less than the harm that would occur in the absence of this power," *Vought*, 558, F.3d at 623, namely, the organizational paralysis that would result from retaining employees whose "'views . . . were not compatible [with those of management] and thus would interfere with smooth application of the new regime's policy,'" *id.* (quoting *Hodge v. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees & Helpers' Local Union 695*, 707 F.2d 961, 964 (7th Cir. 1983)); *see Finnegan*, 456 U.S. at 441-42. The courts have no power to "second-guess that legislative judgment." *Vought*, 558 F.3d at 623.

It makes no difference that when defendants terminated plaintiffs' employment, they terminated plaintiffs' status as SEIU Local 73 members as well. In *Brunt v. Service Employees International Union*, 284 F.3d 715, 719-20 (7th Cir. 2002), the Seventh Circuit explained that, when union employees are terminated over internal political differences with union leadership, "any effect [the termination has] on [their] status as union members [is] merely incidental and does not fall within the scope of protected activity" under the LMRDA. "Discharge from union employment does not violate LMRDA even if it has an indirect effect on union membership rights." *Id.* at 720. If plaintiffs lost their union membership, it was only because their membership in Local 73 was "wholly contingent on their union employment," and the union leadership's right to terminate them without running afoul of the LMRDA "is not affected by the fact that [their] union memberships were also terminated." *Id.*

8

Under the above-cited case law, the LMRDA does not provide plaintiffs with a cause of action against defendants arising out of their suspension and termination. Because they fail to state a claim, their LMRDA claims are dismissed.

## II. BREACH OF CONTRACT CLAIMS

Defendants argue that plaintiffs' breach of contract claims arising out of the collective bargaining agreement between SESU and Local 73, purportedly asserted pursuant to state law, are completely preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

> Section 301(a) of the LMRA states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a). State-law suits of this sort are completely preempted because "[t]he subject matter of § 301(a) is peculiarly one that calls for uniform law . . . . The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Allis-Chalmers* [*v. Lueck*, 471 U.S. 202, 210 (1985)] (quoting *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103 (1962)). And since § 301 completely preempts state-law claims, "[b]y its terms, this provision [also] confers federal subject-matter jurisdiction . . . over 'suits for violation of contracts.'" *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. UAW & Its Local 787,* 523 U.S. 653, 656 (1998); *see also* 28 U.S.C. § 1331.

*Olson v. Bemis Co.*, 800 F.3d 296, 301 (7th Cir. 2015) (internal citations altered). "Settled precedent holds that § 301 . . . completely preempts state law claims 'founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement.'" *Nelson v. Nat'l Hockey League*, 20 F. Supp. 3d 650, 653-54 (N.D. Ill. 2014) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987)). Plaintiffs, who assert that they were terminated without just cause and without notice or due process, in

violation of sections 11 and 12 of the SESU's collective bargaining agreement with Local 73, have raised just such claims. Defendants are correct that these claims are completely preempted.

"[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers*, 471 U.S. at 220. Defendants argue that the Court must dismiss plaintiffs' breach of contract claims, even if it is inclined to treat them as § 301 claims, because plaintiffs have not met their pleading burden. Specifically, defendants argue, plaintiffs have not pleaded sufficient facts to permit a reasonable factfinder to conclude that SESU breached its duty to fairly represent plaintiffs, a prerequisite of any claim asserted by union members against their employer arising out of their collective bargaining agreement. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 914 (7th Cir. 2013) ("When union members sue their employer for breach of contract under section 301 of the LMRA, they must also state a prerequisite claim of breach of their union's duty of fair representation.").

The Court tends to agree. "A union breaches the duty of fair representation if its actions are (1) arbitrary, (2) discriminatory, or (3) made in bad faith." *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018) (emphasis added). In their response brief, plaintiffs cite allegations of the complaint that suggest that SESU did not pursue grievances on plaintiffs' behalf following their termination. (Pls.' Resp. at 7, ECF No. 28 (citing Compl. ¶¶ 37-38, 53-56, 64, 80).) But these allegations are sketchy, containing virtually no factual details other than the bare fact that the union did not pursue plaintiffs' grievances. A labor union "enjoys substantial discretion in fulfilling its duty of fair representation," and "declining to pursue a grievance as far as a union member might like isn't by itself a violation of the duty of fair representation." *Yeftich*, 722 F.3d at 916-17.

True, in *Cunningham v. Air Line Pilots Association, International*, 769 F.3d 539, 542 (7th Cir. 2014), the Seventh Circuit explained that "[a] union would act in bad faith if, for example, it disfavored members who supported a losing candidate for union office." While plaintiffs' grievances concerned a dispute over internal union governance akin to the one the Seventh Circuit described in its example in *Cunningham*, the dispute was over the governance of their employer, Local 73, not the staff union, SESU. As the Court has already explained, SESU and Local 73 are not coextensive, and plaintiffs have not alleged that the SESU members who failed to pursue plaintiffs' grievances were allied with Local 73 leaders or had reason to share their animus against plaintiffs. Further, declining to pursue plaintiffs' grievances would not, by itself, support a reasonable inference of an "'improper motive,'" *Yeftich*, 722 F.3d at 916 (quoting *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)), against SESU, given that Local 73 did not violate plaintiffs' rights under the LMRDA by terminating them, and plaintiffs have provided no other reason why the conduct they sought to grieve—their terminations—was substantively wrongful. It is as likely as not that SESU reasonably viewed plaintiffs' grievances as unfounded and declined to pursue them for that reason, as well as "'in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer.'" *Yeftich*, 722 F.3d at 917 (quoting *Neal*, 349 F.3d at 369).

The Court agrees with defendants that, as in *Yeftich*, plaintiffs' "skeletal allegations . . . are not enough to take the plaintiffs' complaint over the line from a possible to a plausible claim of entitlement to relief." 722 F.3d at 917 (internal quotation marks omitted) (citing *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 557, 570) ("[T]he plaintiffs here have not nudged their claims across the line from conceivable to plausible.")).

Defendants ask for a dismissal without leave to amend, but that result would be overly harsh with respect to plaintiffs' breach of contract claims. "[T]he court should grant leave to amend after dismissal of the first complaint 'unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted.'" *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015) (quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n,* 377 F.3d 682, 687 (7th Cir. 2004) (emphasis added in *Tate*)). Plaintiffs' LMRDA claims are doomed, for the reasons the Court has explained above, but the Court cannot say the same for "certain" for the breach of contract claims, which plaintiffs may be able to replead in accord with this Opinion and the Federal Rules of Civil Procedure. *Cf. Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) ("In applying Rule 15(a), the uncertainty in pleading standards resulting from the Supreme Court's decisions in *Iqbal* and *Twombly* also provides powerful reasons to give parties a reasonable opportunity to cure defects identified by a district court.").

## **CONCLUSION**

For the reasons set forth above, the Court grants defendants' motion to dismiss [16]. Plaintiffs may assert their claims for breach of their collective bargaining agreement in an amended complaint by October 25, 2019. The parties are directed to discuss settlement. A status hearing is set for October 30, 2019.

**SO ORDERED.**                                               **ENTERED: September 27, 2019**

_____
 **HON. JORGE ALONSO**
 **United States District Judge**