**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIE ENGLISH, REMZI JAOS,** | ) | |
| **RICARDO LOZA, BRENDA WOODALL,** | ) | |
| **BASHIR B. NURUDDIN, TOM HALEY,** | ) | |
| **and LEONARD SIMPSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 18 C 5272** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **SERVICE EMPLOYEES INTERNATIONAL** | ) | |
| **UNION, LOCAL 73, and DENISE** | ) | |
| **POLOYAC, individually and as former** | ) | |
| **Trustee of SEIU, LOCAL 73,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs, Willie English, Ricardo Loza, Brenda Woodall, Bashir B. Nuruddin, Tom Haley, and Leonard Simpson, bring this suit against their former employer, Service Employees International Union ("SEIU") Local 73,[1] claiming that they were terminated in violation of their rights under their collective bargaining agreement. Defendants move for summary judgment. For the following reasons, the motion is granted.

**I. Local Rule 56.1 and Objections**

Northern District of Illinois Local Rule 56.1 ("LR 56.1") requires a party moving for summary judgment to file and serve a "statement of material facts," N.D. Ill. LR 56.1(a)(2), consisting of concise numbered paragraphs, "supported by citation to . . . specific evidentiary

---

[1] Initially, plaintiffs also sued Denise Poloyac, formerly one of the trustees in charge of SEIU Local 73, but the parties have stipulated to dismiss the claims against Ms. Poloyac. (*See* Stipulation of Dismissal, ECF No. 140; Aug. 11, 2021 Minute Entry, ECF No. 143.)

material," N.D. Ill. LR 56.1(d). The party opposing the motion for summary judgment is required to file and serve a response, consisting of numbered paragraphs corresponding to each paragraph of the statement of material facts. N.D. Ill. LR. 56.1(b)(2), (e)(1). To the extent the opposing party disputes any of the movant's asserted material facts, the response must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. LR. 56.1(e)(3). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.* Additionally, if the opposing party "wishes to assert facts not set forth in the LR 56.1(a)(2) statement or the LR 56.1(b)(2) response," the opposing party may file a "statement of additional material facts" in the same form as the movant's LR 56.1(a)(2) statement of material facts, LR 56.1(b)(3), and the movant may respond in the same manner prescribed for the opposing party's LR 56.1(b)(2) response, *see* LR 56.1(c)(2).

District courts are entitled to "require strict compliance with local summary-judgment rules." *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 790 (7th Cir. 2019). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact undisputed. *See Lipinski v. Castaneda*, 830 F. App'x 770, 771 (7th Cir. 2020) (affirming district court's decision deeming moving party's facts admitted under Local Rule 56.1 where non-moving party's response purported to "disput[e] several facts," but "cited no supporting evidence and did not offer facts of [its] own to show a genuine dispute"); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial.").

In their Local Rule 56.1(b)(2) response, plaintiffs sometimes purport to deny certain facts asserted by defendant without controverting them with citation to admissible evidence. Instead, they either cite evidence that does not controvert the cited fact or cite no evidence at all. (*See, e.g.*, Pls.' LR 56.1 Resp. ¶¶ 53, 55, 73.) Accordingly, the Court deems such facts admitted to the extent they are supported by citation to record evidence.

Additionally, plaintiffs have filed objections to certain of defendant's responses to their Local Rule 56.1(b)(3) additional material facts, arguing that defendant belatedly raises new evidence and that doing so in its Local Rule 56.1(c)(2) response improperly robs plaintiffs of an opportunity to respond. (*See* Pls.' Objections, ECF No. 164.) Defendant responds that the Court did not grant plaintiffs leave to file these objections, and even if the Court considers them, they are meritless because defendant cited only facts that were "fairly responsive," LR 56.1(e)(2), to the facts plaintiffs raised in their Local Rule 56.1(b)(3) statement, which defendant did not believe were material until plaintiffs sought to rely on them to overcome summary judgment. Defendant is correct that plaintiffs needed leave of court to file these objections, *see* LR 56.1(f), which they did not seek or obtain. Further, the Court tends to agree with defendant that the objections lack merit; notably, Local Rule 56.1(c)(2) expressly contemplates citation to new "evidentiary material" as necessary to "fairly respon[d]," LR 56.1(e)(2), to the Local Rule 56.1(b)(3) statement of additional material facts. But in the end the Court need not rule on the merits of the objections because the Court does not rely on any of the purportedly new evidence. Therefore, the Court overrules the objections as moot.

## II.    Background

Service Employees International Union ("SEIU") is a labor union representing workers in health care, the public sector, and property-related services, including janitors, security guards,

and certain food service workers. Local 73 is an SEIU-affiliated local labor union representing employees in Illinois and northwestern Indiana. Prior to their termination in 2018, plaintiffs were employees of Local 73, working in various positions as union representatives, organizers, and administrators.

The events leading to plaintiffs' termination began in August 2016, when SEIU took Local 73 into trusteeship. Under SEIU's Constitution and Bylaws, SEIU may appoint a trustee to take charge of an SEIU-affiliated local union "'for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of this International Union . . . and such appointment shall have the effect of removing the officers of the Local Union or affiliated body.'" (Pls.' Local Rule 56.1 Resp. ¶ 3, ECF No. 160 (quoting Def.'s Ex. U, 2016 SEIU Constitution and Bylaws at 19, ECF No. 152-2 at 24).) A trustee has authority to "take full charge of the affairs of the Local Union . . . , to remove any of its employees, . . . and to take such other action as in his or her judgment is necessary for the preservation of the Local Union . . . and for the protection of the interests of the membership." (Def.'s Ex. U, 2016 SEIU Constitution and Bylaws at 19, ECF No. 152-2 at 24; *see* Pls.' LR 56.1 Resp. ¶ 5.) On August 3, 2016, SEIU President Mary Kay Henry issued an order establishing an emergency trusteeship over Local 73 due to "[i]ncessant in-fighting" that prevented the union from carrying out "basic governance functions" and "jeopardized the interests of the Local and the membership." (Pls.' LR 56.1 Resp. ¶ 4.)

Despite finding "a culture of deep 'divisiveness' permeating the operations" of Local 73 (*Id.* ¶ 6 (quoting Def.'s Ex. M, Medina Dep. at 61:21, ECF No. 152-1 at 438)), the incoming trustee, Eliseo Medina, retained the vast majority of Local 73's staff. (*Id.* ¶ 7.) Although their

4

memories differ about some of the details, all plaintiffs except Mr. Simpson testified at their depositions that they understood in some sense that their continued employment was conditioned on submitting to the direction of the trusteeship. (*Id.* ¶¶ 7-8.)  Additionally, via a memorandum attached to an August 11, 2016 email, Mr. Medina announced to all staff that the policies in the Local 73 "Personnel Policies and Benefits" manual remained in effect. (*Id.* ¶ 9.) The manual included an "Internet, Email, and Social Media Policy." (Def.'s Ex. SS, Personnel Policies and Benefits Manual at 30, ECF No. 152-6 at 31.) One section of this policy set forth "Guidelines for Employees' Responsible Use of the Internet, Email and Social Media," which were intended to "reflect the 'duty of loyalty' every employee owes its employer." (*Id.* at 32.) This section provided that "[t]he Union prohibits the distribution of and posting of disparaging, disloyal or defamatory statements about the Union and its business interests and about the Union's Officers or their business and personal interests," and employees "should also avoid internet, email and social media communications that could be understood to damage the Union's goodwill and business reputation, or any of the Union Officer's [*sic*] goodwill, business and personal reputations." (*Id.*) Similarly, the following section, "Protect the Union's Goodwill and Business Reputation," provided that Local 73 employees were prohibited from "distributing or posting disparaging or defamatory statements about the Union or its business interests," and they should "[b]e respectful to SEIU Local 73 and be professional and honest in [their] communications." (*Id.* at 33.) Further, if they were to see "content [o]n the internet, email or social media that disparages or reflects poorly on SEIU Local 73 or its officers, members or employees," they should "contact the President and Vice President in charge of [their] division," because "[p]rotecting SEIU Local 73 goodwill and reputation is every employee's job." (*Id.*)

In the spring of 2017, the trusteeship changed hands. Mr. Medina was replaced by two co-trustees, Denise Poloyac and Diane Palmer. Remzi Jaos, [2] a Local 73 employee who worked as the director of the higher education division, became dissatisfied with the trusteeship's management of Local 73's affairs, and he began to have discussions about putting together a slate of candidates to run for office in the next Local 73 election. Although he was terminated in June 2017, Mr. Jaos continued to speak with plaintiffs and others about forming a slate of candidates to run in elections following the end of the trusteeship. Because, under the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411 *et seq.*, a trusteeship becomes presumptively invalid after eighteen months, [3] he anticipated that elections would occur sometime in early 2018. The slate became known as the "Members Leading Members" slate, and in December 2017, Jaos met with plaintiffs and others to discuss who would run for what position. (Pls.' LR 56.1 Resp. ¶ 23 (citing Def.'s Ex. K, Jaos Dep. at 60:3-65:7, ECF No. 152-1 at 237-39); *see also* Def.'s Ex. K, Jaos Dep. at 65:8-68:4.)

Amid these December 2017 discussions, with input from plaintiffs and other like-minded colleagues, Jaos put together a "Members Leading Members" website. (Def.'s LR 56.1 Resp. ¶ 19, ECF No. 162; Pls.' LR 56.1 Resp. ¶ 27; *see* Jaos Dep. at 85:8-98:9.) The website identified the slate's candidates, including plaintiffs, and set forth their biographies. (Def.'s LR 56.1 Resp. ¶ 19.) One section of the website, under the heading "Why We Are Running For Local 73 Office," and

---

[2] Originally, Remzi Jaos was one of the plaintiffs in this action, but after the Court dismissed plaintiffs' initial complaint (*see* Sep. 27, 2019 Mem. Op. & Order, ECF No. 56) and their amended complaint (*see* Apr. 30, 3030 Mem. Op. & Order, ECF No. 94), Mr. Jaos did not join in the operative second amended complaint (2d Am. Compl., ECF No. 102).

[3] "After the expiration of eighteen months the trusteeship shall be presumed invalid in any such proceeding and its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under section 462 of this title." 29 U.S.C. § 464(c).

the subheading, "It's time for Local 73 to hold elections now!" stated that the trusteeship had been "disastrous," and it had "failed to return power to [the] members or exercise leadership," instead exploring whether to extend the trusteeship or merge Local 73 with another local union. (Def.'s Ex. X, MLM website, ECF No. 152-3 at 25.) According to the MLM website, the "International Union and the Trustees [were] not listening," members had lost confidence in Local 73, and Local 73's staff's morale was low. Therefore, the website read, "***We demand an election right now.***" (*Id.* (emphasis in original); *see* Pls.' LR 56.1 Resp. ¶ 25 (citing Def.'s Ex. X, ECF No. 152-3 at 25).)

On a subpage titled "What Went Wrong," under the heading, "How Did Local 73 Get In This Mess," the website stated that "things went downhill fast over the last few years," particularly when the "trusteeship . . . began to fight among themselves, trying to grab it all," while "ignor[ing] and neglect[ing]" the union's membership, as the "Local was falling apart." (Def.'s Ex. X, ECF No. 152-3 at 32.) In particular, according to the website, Local 73 was not returning phone calls, negotiating contracts, meeting deadlines, or resolving grievances. (*Id.*) The website then set forth a "Leadership Decline Timeline," in which it accused the co-trustees appointed in December 2016 of neglecting Local 73's affairs and ignoring its problems in favor of "playing politics" and "unfairly disciplining and firing experienced staff and skilled negotiators" to replace them with "friends and cronies, leaving [the] members vulnerable." (*Id.* at 33-34.) The website's timeline marked February 3, 2018, as the last day of the eighteen-month period during which the trusteeship was presumptively valid and accused the trustees of "depriv[ing]" Local 73 members "of their right to democratically choose their leaders and run their own Local" and "trying to cling to power and to their big money jobs at [members'] expense." (*Id.* at 34-35.) According to the website, the

MLM slate was composed of "members and staff who refused to tolerate this dysfunction." (*Id.* at 34.)

The MLM website went live in early January 2018, although no elections had been scheduled yet, and the trusteeship was set to continue for the time being, notwithstanding the upcoming expiration of the eighteen-month period of presumptive validity. (Pls.' LR 56.1 Resp. ¶ 28.) The co-trustees became aware of the website on or before January 6. (*Id.* ¶ 24.) After holding a meeting on January 7 with a number of other individuals, the co-trustees decided to suspend plaintiffs on January 8, and unless they received any additional information dictating otherwise, they planned to terminate them on January 10. (*Id.* ¶ 29.)

On January 8, the co-trustees sent each plaintiff a suspension letter, which stated in part that "Due to recent actions affecting the mission and integrity of the Local 73 trusteeship, and activity that undermines the trusteeship and the members' collective bargaining goals, organizing goals and other programs of Local 73, you are placed on suspension immediately, with pay, pending further review by the Trustees." (*Id.* ¶ 30.) None of the plaintiffs contacted the trustees to provide additional information about their activities (*id.* ¶ 31), except for Leonard Simpson, who had sent an email to the co-trustees on January 5, 2018, writing, "I just became aware of my name or my son[']s name on a slate. Be advised neither of us are participants." (*Id.* ¶ 40.) On January 10, 2018, the co-trustees sent each plaintiff—except for Mr. Simpson—a termination letter, stating as follows:

> As an appointed employee of Local 73, you are responsible for conducting yourself in a manner that is consistent with the mission of the Local 73 trusteeship and that helps maintain the integrity of the trusteeship. All members of Local 73 have the right to participate in the internal affairs of the union, but this right of membership does not include the right to appointed employment. You have participated in internet-based activity that includes attacks on the Local 73 trusteeship and the Trustees that are inconsistent with your duties as an employee. These attacks undermine the purposes for which the Trusteeship was established, and they

8

> interfere with the Trustees' efforts to assure the performance of collective bargaining agreements and its other duties as a bargaining representative, restore democratic procedures, and otherwise carry out the legitimate objects of the Local Union.

(*Id.* ¶ 32.) The letters also contained certain individualized information about plaintiffs' various performance deficiencies. On January 19, 2018, the co-trustees sent Mr. Simpson a termination letter, explaining that, although Mr. Simpson had made a statement in response to his suspension, at no point in his statement did he indicate that he had demanded his name be removed from the MLM website, nor had his name been removed from the website, and his failure to dissociate himself from the website was the reason for his termination. (*Id.* ¶ 43.)

Local 73 employees in certain positions are represented by the Service Employees Staff Union ("SESU"). (*Id.* ¶ 49.) The operative collective bargaining agreement ("CBA") between Local 73 and SESU provided that, in most circumstances, Local 73 employees could not be discharged except for "just cause." (*Id.* ¶ 51.) Specifically, under Article 11 of the CBA, Local 73 was required to have "just cause" to discharge employees, and it could not discharge anyone without "progressive discipline," except employees who committed certain "major infractions." (Def.'s Ex. TT, SESU/Local 73 CBA, Article 11, Section 1, ECF No. 152-7 at 13.) Major infractions may include "[i]nsubordination or refusal to perform assigned work" or "[a]ctivity that undermines Elected Officers or willfully undermines members' collective bargaining goals, organizing goals or other programs of Local 73." (*Id.*, Article 11, Section 1.H. & K., ECF No. 152-7 at 14.) Article 12 sets forth a three-step grievance procedure. At "Step 1," the grievant and a union steward are to meet with the grievant's supervisor in an attempt to resolve the matter. (*Id.*, Article 12, Section 2, ECF No. 152-7 at 15.) If the grievance is not resolved, then the union may proceed to "Step 2" by appealing to Local 73's "President, or his/her designee," who "shall"

schedule a "meeting"[4] with the grievant and his or her union representative to attempt to resolve the matter. (*Id.*) Following the meeting, the president or designee is to provide the grievant a written response. (*Id.*) At "Step 3," the union "may" submit the grievance to arbitration." (*Id.*)

On January 11, 2018, Trumaine Reeves, a SESU steward, submitted grievances challenging plaintiffs' suspensions and terminations. (*Id.* ¶ 52.) Charles Harper, another SESU steward who was experienced in grievances and arbitrations, was assigned to plaintiffs' grievances. (*Id.* ¶ 53.) Mr. Harper communicated with plaintiffs about their grievances and represented them at grievance hearings. (*Id.* ¶ 55.)

Following hearings, Local 73 denied plaintiffs' grievances at Step 2 via email on March 13, 2018. (*Id.* ¶ 59.) Tyson Roan, general counsel for Local 73, wrote separate email messages to Mr. Harper regarding each of Mr. English, Mr. Haley, Mr. Loza, Mr. Nuruddin, and Ms. Woodall's grievances, which stated in part as follows:

> You correctly noted during the grievance meetings that all members have the right to participate in the internal affairs of the union. However, that right of membership does not extend to appointed employment. Central to the staff union's defense of the Grievant was a claim that no evidence had been presented to demonstrate that the Grievant was the author or proprietor of the Members Leading Members website. That contention misses the point. In joining together with a slate, the Grievant joined on to the common platform of that slate. By doing so, the Grievant associated with a public website that was highly critical of the trusteeship and that runs directly counter to the Grievant's obligations as an appointed staff person of the Local Union. As just a few examples, the website refers to the trusteeship as "disastrous" and "dysfunctional," and claims that phone calls to the Local aren't being returned, deadlines are being missed, contracts aren't being negotiated and grievances aren't being processed. Even if the Union were to assume that the Grievant did not know about the contents of this website when it was first published, the Grievant certainly became aware of those contents shortly after the publication of the website, yet has shown no evidence of any action taken to change those contents or distance the Grievant from the assertions on this website. To the contrary, the Grievant has continued to publicly associate with this slate of candidates, and, consequently, with the criticisms of the Union. When the

---

[4] Although the CBA uses the term "meeting," the parties tend to refer to these meetings as "hearings" in the briefs and related documents. For consistency, the Court will follow suit.

> trusteeship was put in place, all employees, including the Grievant, were asked if they would support the trusteeship, and each employee said that they would. That support was, and is, a continuing condition of employment for individuals who wish to work for the Local Union in appointed staff positions while in trusteeship. The Local Union cannot have employees who are criticizing the Union on a public website on the one hand be expected to support the Union and run its program on the other. . . . As such, we find that the Grievant's conduct willfully undermines the Local's collective bargaining goals, organizing goals, and other programs. The Grievant's conduct amounts to multiple major cause infractions as explicitly defined in the staff union collective bargaining agreement. Accordingly . . . there was just cause for discharge.

(*Id.* ¶ 60; *see* Exs. YY-BBB, DDD, ECF No. 152-7 at 43 and ECF No. 152-8 at 1-5, 10-12.) As for Mr. Simpson's grievance, Mr. Roan's message stated that it was denied because Local 73 concluded that Mr. Simpson's contention that he had not known of the contents of the MLM website or consented to its use of his name was not credible. (*Id.* ¶ 62.)

Under SESU's Constitution and Bylaws, SESU's Grievance Subcommittee is responsible for evaluating grievances and determining whether to take them to arbitration. (*Id.* ¶ 63.) Mr. Harper provided documents about the substance of plaintiffs' grievances and the proceedings leading to their denial to the three members of the Grievance Subcommittee: Karen Kleinhans DeSilva, Carmen Dickinson, and Liz Towell. (*Id.* ¶ 64.) He also provided his own assessment, which was that most of the grievances were unlikely to succeed. (*Id.* ¶¶ 64-65.) While Mr. Simpson's grievance had some chance of success at arbitration, Mr. Harper believed, because there was some doubt about whether Mr. Simpson had intentionally involved himself in the MLM slate and website, the others had little chance because they had publicly disparaged and undermined the union, or had publicly associated with members who had done so, and/or refused to distance themselves from them. (*Id.* ¶ 65.)

Ms. Kleinhans DeSilva agreed with Mr. Harper's assessment and voted to take Mr. Simpson's grievance to arbitration, but not the others. (*Id.* ¶ 66.) Ms. Dickinson voted against

arbitrating any of the grievances, stating that she did not think SESU could prove that plaintiffs were unaware of the Internet and Social Media policy, which clearly prohibited posting any disparaging statements. (*Id.* ¶ 67.) She did not address the issue of whether there was reason to doubt that Mr. Simpson had intentionally involved himself in the MLM slate. (Def.'s Ex. NN, May 9, 2018 Email from Dickinson to Reeves, ECF No. 152-4 at 55.) Ms. Towell voted to send all of the grievances to arbitration, without explaining her reasoning. (Pls.' LR 56.1 Resp. ¶ 68.)

Charles Harper made a presentation to SESU's Executive Board about the strengths and weaknesses of the grievances, and the Executive Board unanimously voted to accept the Grievance Subcommittee's majority recommendation to take Mr. Simpson's grievance to arbitration, but not the others. (*Id.* ¶ 69.) Mr. Reeves—who, since filing plaintiffs' grievances, had been elected president of SESU in a February 2018 special election, and was therefore a member of the Executive Board—explained that he was reluctant to overturn any recommendation of the Grievance Subcommittee without good reason, and he saw none in this case. (*Id.* ¶ 70.)

While SESU was preparing to take Mr. Simpson's grievance to arbitration, Mr. Simpson testified in *Hunter v. SEIU et al.*, No. 18 C 986, a case filed in February 2018 in which three Local 73 members sought an injunction to end the trusteeship, that he had in fact been part of the MLM slate in January 2018. (*Id.* ¶ 71.) Apprised of this information, Ms. Kleinhans DeSilva reversed her vote to take Mr. Simpson's grievance to arbitration, writing in an email that Mr. Simpson had clearly, "under oath, . . . contradicted his earlier statements to SESU about his involvement with Members Leading Members and the political slate they put forth[, which] contradicts the basis I used, as a grievance committee member for SESU, to vote to proceed to arbitration in his termination." (*Id.* ¶ 72.) Mr. Reeves wrote to Mr. Simpson to ask him to explain the contradiction in his statements to SESU and his deposition testimony in *Hunter*, but Mr. Simpson did not provide

any such explanation. (*Id.* ¶ 73.) SESU's Executive Board voted unanimously to accept the Grievance Subcommittee's revised recommendation and abandoned its efforts to take Mr. Simpson's grievance to arbitration. (*Id.* ¶ 74.)

## III.    Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of [any challenged] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). The court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

In assessing the evidence at summary judgment, the court must consider the facts in the light most favorable to the non-moving party, giving that party "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," regardless of whether it can "vouch for the objective accuracy of all" the evidence the non-moving party puts forward. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014). Even though district courts must view the non-moving party's evidence in this generous light, it does not follow that they are "required to draw every requested inference; they must only draw reasonable ones that are supported by the record." *Omnicare*, 629 F.3d at 704. "Inferences supported only by speculation or conjecture will not suffice." *Johnson*, 892 F.3d at 894.

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), "provides for federal subject-matter jurisdiction over '[s]uits for violation of contracts between an employer and a labor organization,'" including collective bargaining agreements. *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wis. & Its Local 5*, 724 F.3d 939, 944 (7th Cir. 2013) (quoting 29 U.S.C. § 185(a)). When a union employee brings such a suit against his employer for breach of a collective bargaining agreement, the suit is "referred to as a hybrid suit because it is comprised of two causes of action that are 'inextricably interdependent.'" *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 613 (7th Cir. 2001) (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983)). The employee must establish both a breach of the collective bargaining agreement and that his labor union breached its duty of fair representation. *McLeod*, 258 F.3d at 613 (citing *Filippo v. N. Ind. Pub. Serv. Corp. Inc.*, 141 F.3d 744, 748 (7th Cir. 1998)); *see Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997) (explaining that in a "hybrid 301" suit, the contractual claim and the fair representation claim are "interlocked: neither claim is viable if the other fails"). "The latter is required because

the union is responsible for representing its members' interests and addressing their complaints pursuant to whatever grievance process is set up by the relevant collective-bargaining agreement," *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 913-14 (7th Cir. 2013), and courts are not to "'usurp those functions which collective-bargaining contracts have properly entrusted'" to the grievance and arbitration process, *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1297 (7th Cir. 1992) (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563 (1976)), unless "the integrity of the grievance process was subverted by the union," *Thomas v. United Parcel Serv., Inc.*, 890 F.2d 909, 915 (7th Cir. 1989). Thus, the duty of fair representation element is essential to the section 301 claim, even if the employee does not name the union as a defendant, *see Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 803 (7th Cir. 2008), "with the fair representation [claim] serving as the indispensable predicate and a condition precedent to the § 301 suit against the employer." *Thomas*, 890 F.2d at 915 (internal citation and quotation marks omitted). If the employee satisfies this "condition precedent," then courts may resolve the contractual element of the section 301 suit, approaching the issue "'in the same way [they] approach other contracts.'" *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011) (quoting *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 405 (7th Cir. 2002)).

"[T]he duty of fair representation requires a union to 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). "In other words, a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* (citing *Vaca*, 386 U.S. at 190). The duty extends not only to collective bargaining with an employer but also to "'enforcement of the resulting collective

bargaining agreement,'" including "'provisions for processing grievances.'" *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016) (quoting *Vaca*, 386 U.S. at 177, and *NRLB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967)).

Courts afford unions "considerable discretion in dealing with grievance matters." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (internal quotation marks omitted). "The union may . . . consider the merits of the case or the effect on the larger collective bargaining unit in making various strategic decisions during the grievance procedure." *Id.* Because the union "represents the majority of employees, even while it is representing a single employee in a grievance process," the union's "own credibility, its integrity as a bargaining agent and the interests of all its members may be at stake." *Id.* "The union is therefore entitled to enjoy a somewhat different perspective than the individual employee it represents in a grievance matter." *Id.* Thus, "declining to pursue a grievance as far as a union member might like isn't by itself a violation of the duty of fair representation." *Yeftich*, 722 F.3d at 916. While the union may not "'arbitrarily ignore a meritorious grievance or process it in perfunctory fashion,'" *id.* (quoting *Vaca*, 386 U.S. at 191), it "'has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer,'" *Yeftich*, 722 F.3d at 916 (quoting *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)).

But the union's discretion is not unlimited, and, to defeat a motion for summary judgment, the employee need only demonstrate a genuine issue of material fact on any one of the three elements of the "tripartite standard" for violations of the duty of fair representation. *Filippo*, 141 F.3d at 748. Therefore, to resolve the fair representation issue, the Court must make three separate

inquiries: "(1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the union act in bad faith." *Ooley*, 961 F.2d at 1302.

Courts determine whether a union acted arbitrarily by making an "objective inquiry," *Neal*, 349 F.3d at 369, that is "highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their . . . responsibilities," *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991). A union's decision is "arbitrary" when it is "so far outside a wide range of reasonableness that it is wholly irrational." *Id.* at 78 (internal citation and quotation marks omitted). Additionally, the plaintiff must establish not only that the union acted arbitrarily, or "wholly irrational[ly]," *id.*, but also "that the plaintiff was actually harmed by the union's actions," *i.e.*, "that the outcome of the [grievance] would probably have been different but for the union's activities." *Garcia*, 58 F.3d at 1176-77.

Determining whether a union's action is discriminatory or in bad faith, on the other hand, "calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369. Improper motives may include "legally prohibited reasons" such as race or sex discrimination, or, "in bad faith cases," a "*sole* motive . . . to punish . . . political opponents"—but "expanding the realm of discriminatory or bad faith actions much beyond these narrow categories" would be contrary to the "broad deference [due] to union leaders in solving intractable problems in distributive justice" under *O'Neill*. *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 404 (7th Cir. 2018) (Hamilton, J., concurring in the judgment). For example, "[a] union would act in bad faith if . . . it disfavored members who supported a losing candidate for union office." *Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539, 542 (7th Cir. 2014). "'Deceptive actions' or 'fraud' can be relevant to whether a union acted in bad faith." *Bishop*, 900 F.3d at 398 (quoting *Yeftich*, 722 F.3d at 916).

**IV.    Discussion**

Local 73 argues that plaintiffs have not adduced sufficient evidence to establish a genuine issue of material fact on either element of their section 301 claim. That is, according to Local 73, no reasonable juror could find that Local 73 breached the CBA by terminating plaintiffs without just cause or for conduct that did not rise to the level of major cause infractions under Article 11, nor could any reasonable juror conclude that SESU breached its duty of fair representation by declining to take their grievances to arbitration.

Plaintiffs respond that Local 73 did not have just cause to terminate them for their association with the MLM slate and website because plaintiffs were not aware of the content of the MLM website before it went live and should not be held responsible for it. Further, they respond that there is enough evidence that SESU's reasons for dropping their grievances were fishy or illogical to create a genuine dispute of material fact on the question of whether SESU breached its duty of fair representation.

Although the issue of a union's representation of its members in grievance proceedings "temporally" follows the issue of whether the employer breached the CBA by taking the adverse action giving rise to the grievances, courts may properly begin with the fair representation issue. *Thomas.*, 890 F.2d at 915; *see Rupcich*, 833 F.3d at 859-60. The Court does so here.

**A.  Duty of Fair Representation Claim**

Plaintiffs identify three reasons for finding that SESU acted either arbitrarily or with an improper motive—*i.e.*, discriminatorily or in bad faith—when it declined to pursue their grievances.

First, the Grievance Subcommittee's recommendation was not unanimous. One Grievance Subcommittee member, Liz Towell, voted to send all of plaintiffs' grievances to arbitration.

According to plaintiffs, this alone demonstrates a genuine issue of material fact, the point being, apparently, that if at least one Grievance Subcommittee member believed that the other Grievance Subcommittee members were wrong, then a reasonable juror might agree with her.

Second, Mr. Jaos opines, based on his vast experience with grievance issues, that Mr. Reeves's stated reasons for the Executive Board's decision do not hold up to scrutiny. Mr. Reeves suggested that, as an Executive Board member, he voted not to take plaintiffs' grievances to arbitration because he judged that they were not likely to succeed and he was reluctant to overrule the Grievance Subcommittee without good reason. Mr. Jaos, who has vast experience with grievance matters, opined that plaintiffs' grievances likely would have succeeded because plaintiffs had little opportunity to respond to their suspension prior to termination, they were not subjected to progressive discipline, and there was no evidence that they had authored or approved the content of the MLM website.

Third, plaintiffs argue that neither Local 73 nor SESU made any serious effort to investigate the circumstances leading to plaintiffs' termination, so SESU could not have properly concluded that plaintiffs were likely guilty of the misconduct for which they had been terminated.

### 1. Whether SESU acted arbitrarily

To demonstrate that a reasonable juror could find that SESU acted arbitrarily, plaintiffs' task is "not merely to demonstrate that [their] favored reading of the labor contract is as plausible as the union's, thus creating an issue of material fact regarding the correct interpretation, but rather to show that the union's reading could eventually be deemed not even colorable, thus creating an issue of material fact regarding arbitrariness." *Trnka v. Loc. Union No. 688, United Auto., Aerospace & Agric. Implement Workers of Am.*, 30 F.3d 60, 61-62 (7th Cir. 1994). Plaintiffs must

demonstrate that "the union's rejection of [their] interpretation was wholly irrational, "not just possibly incorrect." *Id.* at 62.

Nor may plaintiffs survive summary judgment by adducing evidence proving merely that SESU could have investigated the grievances more thoroughly. *See Garcia*, 58 F.3d at 1176 ("The union must provide some minimal investigation of employee grievances, but the thoroughness of this investigation depends on the particular case, and only an egregious disregard for union members' rights constitutes a breach of the union's duty.") (internal quotation marks omitted). In making grievance-processing decisions, including how thoroughly to investigate a member's grievance, the union may rely on its good-faith, fair, and reasonable interpretation of its collective bargaining agreement to determine how detailed an investigation is necessary to its evaluation of the grievance. *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 694 (7th Cir. 1982) ("The thoroughness of the union's investigation must be evaluated in light of [the relevant union representative's] rational and honestly held belief that [the employer] was free to terminate [the grievant] without further recourse."). The bottom line is that, given the deference courts owe to a union's grievance-processing decisions, courts "should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley*, 961 F.2d at 1302; *see McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 868 (7th Cir. 1997) ("[T]he question now before us is not whether a reasonable jury could find that McKelvin was not insubordinate. Instead, we must consider whether a reasonable jury could conclude that the union's decision was irrational.").

Local 73 denied plaintiffs' grievances at Step 2 because, even assuming plaintiffs were truly unaware of the contents of the MLM website in early January 2018, they "certainly became aware of those contents shortly after the publication of the website," but they had "shown no

evidence of any action taken to change those contents or distance [themselves] from the assertions on the website," and instead had "continued to publicly associate with [the MLM] slate of candidates, and, consequently, with the criticisms of the Union." (Pls.' LR 56.1 Resp. ¶ 60.) The members of SESU's Grievance Subcommittee and Executive Board were aware that the MLM website identified plaintiffs as candidates by name, and, months after they were terminated, none of the plaintiffs other than Mr. Simpson had made any discernable effort to back away from the offensive statements made on the MLM website, whether by attempting to change them, disavow them, or remove their names from the MLM website. Plaintiffs had still not renounced the MLM slate or website, nor had they refuted the association with the website created by the appearance of their names there; they had only contended that they were not personally responsible for drafting the content of the website or posting it. There is no genuine dispute that Charles Harper, who was experienced in representing members in grievance proceedings, met or spoke with all of plaintiffs before their grievance hearings, so they had an opportunity to make a more sweeping disavowal of the MLM slate and the website's criticisms of Local 73 and the trusteeship.

As for Mr. Simpson, his example tends to show that, had plaintiffs been able to plausibly deny their association with the MLM slate and the website's criticisms, it likely would have made a difference to the union, and their grievances might have proceeded to arbitration. That is because SESU initially advanced Mr. Simpson's grievance to arbitration, and it only reversed course when it became clear that Mr. Simpson had not been truthful when he initially claimed to have been uninvolved in the MLM slate at the time of his suspension and discharge in January 2018; rather, he had been trying to "straddle[e] the fence" between the union's factions. (Pls.' LR 56.1 Resp. ¶ 45.)

21

The majority of the Grievance Subcommittee and the members of the Executive Board all seemed to agree that an arbitrator would be likely to rule that, if plaintiffs had knowingly, openly, and unapologetically associated themselves with the MLM slate and website, after they had been warned that they must abide by the "Internet, Email, and Social Media Policy" in the "Personnel Policies and Benefits" manual, then Local 73 had just cause to terminate them immediately for a major cause infraction. Even if reasonable minds might differ, "in the ultimate analysis," *see Rupe*, 679 F.2d at 693, as to the correctness of that interpretation, it is, objectively, at least "'colorable,'" given the clear prohibition of publicly disparaging or undermining the union and of insubordination. *See McKelvin*, 124 F.3d at 868 (quoting *Trnka*, 30 F.3d at 61). Indeed, plaintiffs do not seem to dispute it; rather, their position at summary judgment seems to assume that it is correct, to the extent they focus on arguing that plaintiffs were not directly involved in generating or publishing the content of the MLM website. But that argument ignores the point that, even if they had not known what the MLM website would say in advance, they did not distance themselves from it even after it went live.

The union apparently believed that an arbitrator would conclude that maintaining their association with the MLM slate and website beyond January 2018 provided just cause for plaintiffs' termination, and, given the factual circumstances, no reasonable juror could conclude that SESU's conclusion in that regard was objectively irrational. Rather, the decision appears to have been within SESU's wide range of discretion, and plaintiffs' arguments do not convince the Court otherwise. First, citing the bare, unadorned fact that one Grievance Subcommittee member would have voted to send plaintiffs' grievances to arbitration does not aid the Court in determining whether SESU acted arbitrarily because it does not say anything about the reasons for or reasonableness of any of the various union members' actions. Ms. Towell may have disagreed

with the other union members about whether to arbitrate plaintiff's grievances, but if it was the sort of close call about which reasonable minds could disagree, then the mere fact of the disagreement provides no reason to be suspicious of the motive for or merits of the decision. Plaintiff has not come forward with evidence to establish that this decision was outside that wide range of discretion.

Second, regarding Mr. Jaos's opinion, the Court first mentions, as defendant points out in reply, that the opinion is not admissible evidence: plaintiffs did not disclose Mr. Jaos as an expert under Federal Rule of Civil Procedure 26(a)(2), the parties did not engage in expert discovery, and the Court has no basis to conclude that Mr. Jaos is an expert qualified to give opinion testimony under Federal Rule of Evidence 702. Even leaving that issue aside, Mr. Jaos's testimony does not raise a genuine issue of material fact as to whether SESU acted arbitrarily for the same reason Ms. Towell's vote doesn't: although it may demonstrate that reasonable union representatives might have disagreed about whether plaintiffs' grievances had merit, it does not demonstrate that the union's position was "not even colorable." *Trnka*, 30 F.3d at 61-62; *see McKelvin*, 124 F.3d at 868.

Third, the Court fails to see anything irrational in the union's failure to do any additional investigating because, given its interpretation of the CBA, it was "simply not apprised of any facts or contentions that warranted further investigation." *Rupe*, 679 F.2d at 694. Although plaintiffs believed that Local 73 did not have just cause to terminate them because they had not authored or approved the disparaging statements on the MLM website, Local 73 had taken the position that there was just cause for termination in plaintiffs' continued association with the MLM slate, even after becoming aware of the contents of the MLM website, when plaintiffs should have disavowed or distanced themselves from the MLM website's disparaging assertions. Thus, the difference

between the parties was a matter of the legality of what plaintiffs had done or omitted to do; SESU was not apprised of a factual dispute that required further investigation, particularly considering that plaintiffs had made no serious attempt to dispute what SESU considered to be the material facts during the grievance process. The union's conclusion that it could not win at arbitration under these circumstances was within the wide range of reasonableness that the union enjoyed. *See Rupe*, 679 F.2d at 694; *see also McLeod*, 258 F.3d at 616 (grievants "themselves limited [the] scope" of the investigation by their actions), *Neal*, 349 F.3d at 370 (affirming summary judgment for employer on fair representation issue where grievants were familiar with grievance process, but did not take obvious actions to help themselves through the process).

For all these reasons, the Court finds nothing in any of the factual issues plaintiffs have raised to demonstrate that SESU acted arbitrarily, *i.e.*, wholly irrationally. To the contrary, its actions were reasonable and within the broad discretion it enjoyed in processing grievances.

### 2. Whether SESU's decision was discriminatory or in bad faith

Plaintiffs' argument that SESU acted discriminatorily or in bad faith seems mainly to hinge on the same logic as their arbitrariness argument; that is, the argument seems to be that SESU must have had an improper motive for its actions because they defy explanation otherwise. For the foregoing reasons, the Court disagrees, and given that SESU's decision not to pursue plaintiffs' grievances at arbitration was not wholly irrational, the mere fact of the decision provides no reason to be suspicious of its motives. *See Trnka*, 30 F.3d at 63 (mere suggestion that union dropped plaintiff's grievance "in retaliation for his past criticism of union leadership and policies," without more, was improper "*post hoc, propter hoc* reasoning" that did not suffice to "stave off summary judgment").

Plaintiffs also suggest that a reasonable juror could find that SESU acted in bad faith in order to push plaintiffs out as rivals, based on the fact that Trumaine Reeves and Dian Palmer ended up earning promotions and election to office, respectively, within Local 73. Additionally, plaintiffs suggest that Reeves was part of a faction of Local 73 employees who had clashed with members of the MLM slate, including Jaos and plaintiff Woodall. (*See* Def.'s LR 56.1 Resp. ¶¶ 5-6.) But Dian Palmer was not involved in SESU, so the Court fails to see the relevance of her election to office. And Trumaine Reeves played a relatively small role in the key decisions. Although he voted against taking plaintiffs' grievances to arbitration as an Executive Board member, his was only one of several votes, and the Executive Board vote was unanimous, so his vote ultimately made no difference. To the extent that the outcome would have been the same either way due to Mr. Reeves's limited role in the decision, SESU's liability cannot rest on his actions alone. *See Garcia*, 58 F.3d at 1177 (citing *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir. 1994)); *Ooley*, 961 F.2d at 1303-04. Plaintiffs have not adduced evidence that Mr. Reeves influenced SESU's decision in some other way behind the scenes, apart from vaguely suggesting that there was bad blood stemming from past disputes between plaintiffs and their allies, on one side, and an ally of Mr. Reeves on the other. That is not enough to survive summary judgment. *See Trnka*, 30 F.3d at 63.

Plaintiffs have not come forward with sufficient evidence to permit a reasonable jury to find that SESU breached its duty of fair representation. Therefore, defendant is entitled to summary judgment on that issue.

## B.  Breach of Contract Claim

In light of the above discussion, the Court need not reach the merits of plaintiffs' breach of contract claim. Because plaintiffs have failed to come forward with sufficient evidence to support

a finding in their favor on the fair representation claim, they cannot avoid summary judgment in this hybrid section 301 suit, regardless of whether Local 73 breached the CBA. *See McKelvin*, 124 F.3d at 869; *see also Filippo*, 141 F.3d at 750, *Rupcich*, 833 F.3d at 859-60. The Court's grant of summary judgment on the fair representation issue is fully dispositive of plaintiff's hybrid section 301 claim.

## **CONCLUSION**

For the reasons set forth above, the Court grants defendants' motion for summary judgment [150]. Civil case terminated.

**SO ORDERED.**                                        **ENTERED: September 13, 2022**

                                                       _____
                                                       **HON. JORGE ALONSO**
                                                       **United States District Judge**

26